UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*IN RE*: BOPCO, L.P.                                    CIVIL ACTION

                                                       NO: 11-3137

                                                       SECTION "C"(5)

## OPINION

A trial was held in the above captioned matter on July 22, 2013 through July 24, 2013. Negligence was tried to the jury and the issue of limitation of liability was tried to the Court without a jury. Rec. Doc. 108.  The parties previously moved to try issues of negligence and damages to the jury, with the Court to determine whether the defendant/petitioner ("defendant") was entitled to limit its liability, and the Court granted that motion. Rec. Doc. 35.  The jury found in favor of the plaintiff/claimant ("plaintiff"), and found that the plaintiff was contributorily negligent. Rec. Doc. 108-1.  Having considered the testimony, the evidence adduced at trial, the record, and the law, the Court now finds in favor of the plaintiff and against the defendant on the issue of limitation of liability.

## I. BACKGROUND

The following facts are undisputed.  On April 13, 2011, an accident occurred at the intersection of the Back Levee Canal and the Main Canal at Point à La Hache, Louisiana. Rec. Doc. 92 at 5.  Defendant BOPCO, L.P.'s vessel, the M/V MR. JOE ("MR. JOE"), driven by Tyrell DuPont, collided with plaintiff Ryk Frickey's vessel as Frickey was returning from checking his crab traps. Rec. Doc. 92 at 3.  The day that the accident occurred was a clear day.

1

However, when DuPont and Frickey approached the intersection, their view of each other was partially obstructed by vegetation and marsh grass at the corner of the intersection. *Id.* At the time of the collision, the MR. JOE had an operational radar system, but it was not in use. Tr. July 24, 2013 at 66.  BOPCO has stipulated that the value of its vessel was $45,000. Tr. July 24, 2013 at 97.   Frickey alleges that he was injured as a result of the accident. Rec. Doc. 92 at 5.  In addition to being unable to return to work, Frickey underwent surgery for a lumbar fusion. *Id.* BOPCO filed this petition for limitation of liability under Rule 9(h) of the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty and Maritime claims, and 46 U.S.C. §30501, *et seq.* Rec. Doc. 1. Frickey counterclaimed alleging that BOPCO was negligent. Rec. Doc. 9 at 10. Jurisdiction is proper in this Court pursuant to its admiralty and maritime jurisdiction, 28 U.S.C. § 1333.  At trial, the Court heard testimony from thirteen witnesses: Joel Michael Barrios, Ryk Frickey, Kathaleen Landry, Dr. Zoran Cupic, Dr. Angel M. Roman, Jr., Dr. Ken McCoin for the plaintiff, and from Tyrell Dupont, Dr. Najeeb M. Thomas, Nancy T. Favaloro, John Therior, Pierre Gautreaux, Brandon Breaux, and Kenneth Fernandez for the defendant. Rec. Doc. 105; Rec. Doc. 106; Rec. Doc. 108.

## II. LIMITATION OF LIABILITY

The Court must determine only whether BOPCO is entitled to limitation of its liability. The Limitation of Liability Act provides that a vessel owner may limit its liability after an accident to the value of the vessel and pending freight. 46 U.S.C. § 30505(a); *In re Omega Protein, Inc.*, 548 F.3d 361, 371 (5th Cir. 2008).  Despite this, if "the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the [defendant]-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts.'" *Id.* (citing *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 789 (5th Cir. 2003)).  Privity or knowledge is understood to be complicity in the fault that caused the accident.

2

*Omega Protein*, 548 F.3d at 371 (citing *Brister v. A.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991)).

Privity or knowledge is imputed to a shipowner if he personally participated in the negligent

conduct or brought about the unseaworthy condition. *Trico Marine*, 332 F.3d at 789 (citing

*Pennzoil*, 943 F.2d at 1473).  A corporation has knowledge of the negligent act if its managing

officers knew or should have known about conditions or accidents likely to cause the loss. *Id.*

The corporation may be found to have knowledge if the negligent condition could have been

discovered through reasonable diligence. *Brister*, 946 F.2d at 356.  The corporation must

overcome a presumption that its officers and managers had actual knowledge, and that they

should have known of the negligent condition that caused the harm. *Id.*  The burden of proving

lack of privity or knowledge of the negligence by a preponderance of the evidence is on the

owner of the vessel seeking to limit its liability.[1] *Omega Protein*, 548 F.3d at 367; *Brister*, 946

F.2d at 355 (citing *In re Farrell Lines, Inc.*, 530 F.2d 7, 10 (5th Cir. 1976)).

### A. Pilot Error

BOPCO argues that it is entitled to limit its liability because this is "a classic case of pilot

error." Rec. Doc. 116 at 5.[2]  Despite a finding of negligence, a shipowner may limit his liability

---

[1]Frickey repeatedly makes the mistaken argument in its post-trial briefing that the burden of proof for limitation of liability is on BOPCO because of the *Pennsylvania* rule, 86 U.S. 125, 136 (1873). Rec. Doc. 122 at 2 & 4; Rec. Doc. 117 at 6.  BOPCO does have the burden of demonstrating a lack of privity or knowledge to limit its liability, but that is not because of the *Pennsylvania* rule.  The *Pennsylvania* rule applies to the determination of negligence, which has already been determined by the jury.

[2]In support of this argument, BOPCO's counsel misrepresented to the Court a quotation from *Mack Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982). BOPCO quoted the case as stating: "no court has previously denied a corporate ship owner limitation of liability for a master's navigational errors at sea when the owner has exercised reasonable care in selecting the master." This quotation does not appear in *Mack Towing*.  The closest the *Mack Towing* Court comes to this statement is saying that: "Ordinarily 'errors in navigation or other negligence by master or crew are not attributable to (the shipowner) for limitation purposes.'" *Id.* at 548.  The Court acknowledges that the quotation may appear in another case, and therefore the Court shall assume that the misquote is merely a clerical error rather than a willful misinterpretation, but it cautions counsel to be more careful in the future.

where the negligence resulted from "mistakes of navigation." *Brister*, 946 F.2d at 356 (citing *In re Hellenic Lines, Ltd.*, 813 F.2d 634, 638 (4th Cir. 1987)).  BOPCO analogizes the present case to *Omega Protein* where the Court found that Omega did not have knowledge or privity of the captain's acts because it had exercised reasonable care in selecting a qualified and competent captain. 548 F.3d 361, 374 (5th Cir. 2008).  BOPCO points out that the *Omega Protein* district court found that Stewart, the ship's captain, did not have a pattern of improper or unsafe behavior. Rec. Doc. 116 at 8.  The Court found that Stewart had a spotless record over his twenty-year career as a pilot and a captain. *Omega Protein*, 548 F.3d at 373.  DuPont was BOPCO's captain. While the Court does not doubt DuPont's record as a pilot, BOPCO is not free from liability just because it hired him.  Citing *Omega Protein*, BOPCO argues, "[t]he Fifth Circuit noted that while Omega did not train Stewart on how to use the anti-collision alarm, the district court found that this feature was not very useful because the Gulf was littered with obstructions." Rec. Doc. 116 at 8.  The Court has not made a similar finding about obstructions in this case.

BOPCO also pointed out to the Court that the Fifth Circuit, in *Omega Protein*, "observed that the district court did not find that defects in the radar or other navigational aids caused the allision. . . ." Rec. Doc. 116 at 8.  Rather, BOPCO explains, the Fifth Circuit found that a "mirror effect" from the wheelhouse lights prevented Stewart from either seeing out of the windows or viewing the radar. *Id.*  While BOPCO does not make an explicit argument to the Court based on this case, it seemingly implies that the Court should find the same way as the Court did in *Omega Protein*.  BOPCO wishes the Court to find that the accident at issue here is a case of pilot error because the radar or other navigational aids did not cause the collision.  The *Omega Protein* case, while applying the standard for limitation of liability, is factually distinct from the present case. In this case, there was no "mirror effect" that prevented DuPont from seeing Frickey.  This case is more similar to *Trico Marine Assets*, 332 F.3d at 790, where the Court found that the defendant

4

had privity and knowledge of the Captain's negligence and participated in the negligence that caused the collision by (1) failing to provide a lookout, (2) failing to train the Captain on how to use radar, (3) failing to evaluate the ship's seaworthiness or the Captain's competence, (4) failing to inspect the vessel logs, (5) failing to employ a safety manager, and (6) failing to provide safety training or safety manuals.

BOPCO also cites to *Matheny v. Tennessee Valley Authority*, 557 F.3d 311 (6th Cir. 2009), as an instance where a court reversed the district court's decision denying limitation of liability based on "mistakes of navigation."  Once again, BOPCO did not make a specific argument based on this case but appears to argue that the Court should not deny limitation of liability in this case because it is about "mistakes of navigation" just as the *Matheny* case was. Rec. Doc. 116 at 9.  BOPCO uses *Matheny* as an example for where a Circuit Court "noted that the captain's errors were mistakes of navigation and that he had proven himself up to the time of the accident to be competent." *Id.* at 9.  BOPCO also states that in *Matheny* the Sixth Circuit held that the tug owner did not negligently supervise the ship's captain, and that therefore the tug owner was not barred from limitation of liability when the tug owner relied on "the navigational expertise of an experienced competent operator with knowledge of Inland Navigation Rules." *Id.* In *Matheny*, the Sixth Circuit found that the district court had misread the Limitation of Liability Act by finding it to be about risks rather than acts. *Matheny*, 557 F.3d at 316.  The Circuit Court explained that limitation of liability is based on privity or knowledge of the specific negligent act or unseaworthy condition, and that the district court's finding that the Tennessee Valley Authority "was aware of the fact that *if* a tugboat operates at an excessive speed it *may* create a dangerous wake for nearby recreational boats" was the wrong analysis. *Id.*  The Circuit Court specifically explained that: "The district court also found Captain Ralls had been tested on the 'Rules of the Road' aspect of the Inland Rules of Navigation by the Coast Guard, had been trained in collision

avoidance and considered the wake of his boat hitting another boat a collision." *Id.* at 316.  The

Circuit Court found that because Ralls was a competent captain conversant in the Inland Rules of

Navigation, he did not need to be told that an excessive wake would be dangerous to shipping

boats and that the TVA could rely on his "navigational knowledge." *Id.* at 317.  While this Sixth

Circuit case is not binding on this Court, the Court finds that the facts, including that the captain

had received prior training, make the case significantly factually different than the present case.

BOPCO also cited an Eighth Circuit case on pilot error, *In Re MO Barge Lines, Inc.*, 360

F.3d 885, 891 (8th Cir. 2004).  In that case, the Eighth Circuit affirmed the district court's finding

that Missouri Barge hired "a licensed, competent operator to navigate its vessel." *Id.* at 891.  The

Court found pilot error was the fault of the collision.  The Court specifically explained that the

pilot had made a decision that "he thought it useless to increase the radar's range to identify the

approaching 'mass of lights.'" *Id.* The Court found that the pilot had mistakenly relied on

binoculars, rather than that the captain was unable to operate the radar. *Id.*  The *MO Barge Lines*

case is different from this case where DuPont did not make a *decision* not to operate the radar

because he thought it would be a better idea to use binoculars.  Rather, DuPont followed

BOPCO's *policy* not to operate the radar system on a clear day in the channel. Tr. July 24, 2013 at

41.  BOPCO argues that Frickey submitted no evidence that failure to use the radar in this

particular situation was improper. Rec. Doc. 116 at 12.  To the contrary, failure to use the radar in

this situation violated the Rules of Inland Navigation ("Rules of the Road"), Rule 7(b).[3]  The

Court does not believe that the negligence at issue here occurred merely as a result of pilot error.

### B. Privity or Knowledge

---

[3]Rule 7(b) states: "Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects."

BOPCO also argues that there is no causal relationship between the shipowner's privity or knowledge and the claimant's loss. Rec. Doc. 116 at 5. The Court finds that there is a causal relationship between the shipowner's privity or knowledge and the claimant's loss. Specifically, BOPCO had privity or knowledge of the claimant's loss because it (1) failed to train DuPont, and (2) not only failed to require the use of radar, but had a policy stipulating that radar should not be used in conditions such as those on the day of this accident. The Court does not agree with BOPCO's claim that Frickey confuses operator fault with management fault. Rec. Doc. 124 at 1.

### 1. Failure to Train

BOPCO clearly failed to train DuPont on the Coast Guard's Rules of the Road. BOPCO argues that it did not need to train DuPont on the Rules of the Road because he already knew them. Rec. Doc. 116 at 12. To the contrary, DuPont admitted at trial that neither BOPCO nor any other employer had trained him on the Rules of the Road. Tr. July 22, 2013 at 38. He testified that if he had been trained on the Rules of the Road, he would have followed them. *Id.* at 39. While DuPont knew that he was required to follow the Rules of the Road, and had a general knowledge of what he thought the rules were, his idea of the Rules of the Road was clearly hazy, and this led him not to follow the Rules, which led to the collision. As DuPont explained, he was obeying the Rules of the Road "to the best of [his] knowledge." Tr. July 24, 2013 at 62. The problem is, BOPCO had not made sure that he had knowledge of the rules. Without this knowledge, DuPont did not understand that he did not have the right of way when he went into the intersection.

DuPont also lacked training in the form of prior experience or a boating license. DuPont testified that he does not have a boating license. Tr. July 24, 2013 at 71. While a license may not be legally required, qualifying for it would have been a way that DuPont would have been trained and would have been a qualification that BOPCO could have relied on to demonstrate its

diligence in checking DuPont's safety competence before it hired DuPont to drive its vessels.

DuPont had admitted in his deposition that he had not done anything prior to the accident to learn

the Rules of the Road, but at trial he claimed his past work experience provided him knowledge

of the Rules of the Road. Tr. July 24, 2013 at 71-72. The Court finds this revision not to be

credible.  As experience, DuPont stated that he had worked as a deckhand for two years, worked

on a jack-up boat for two years and "worked on the waters before that for almost ten years

operating." *Id.* at 71.  None of this demonstrates that BOPCO should have believed DuPont had a

clear understanding of the Rules of the Road.  The Court agrees with Frickey that it was not

enough for BOPCO's safety manual to require a vessel operator to know and obey the Rules of

the Road. Rec. Doc. 117 at 2.  BOPCO needed to train DuPont on the Rules.  It was required to

do due diligence to know that DuPont had not received past training, and BOPCO's lack of due

diligence leads to privity or knowledge of the accident that ensued as a result of DuPont not

receiving proper training.

        Frickey argues that BOPCO had privity or knowledge because DuPont violated the Rules

of the Road.  Specifically, Frickey argues that DuPont violated Rule 7(b), Rule 9(f), Rule 16,

Rule 15, and Rule 6. Rec. Doc. 117 at 4-11.  As detailed above, Rule 7(b) requires that proper use

shall be made of radar equipment if fitted and operational.  It is undisputed that the radar was

operational on the MR. JOE and that DuPont was not using it at the time of the accident. Tr. July

24, 2013 at 66.  The Court does not agree with BOPCO that the definition of the word "proper,"

in the context of the rule, means discretionary use. Rec. Doc. 116 at 2.  BOPCO attempts to argue

that it was "proper" not to use radar on the day of the collision because it was a clear and sunny

day and radar is used in fog and in open waters. *Id.*  Rule 4 clearly states that the rules discussed

in this Order and Reasons apply in any condition of visibility.  There is no caveat in Rule 7(b)

that radar should only be used "if warranted under the prevailing conditions" as there is in Rule

8(a)-(b) a hedging statement that the rules apply "if the circumstances of the case admit" and in Rule 19(b)-(c) a statement that the rule applies with regard "to the prevailing circumstances and conditions of restricted visibility." Rec. Doc. 122 at 9.

If DuPont had known that he was required to use the radar, and therefore had been using it, the collision would have been prevented because DuPont would have been forewarned that he was approaching Frickey's boat. Additionally, if DuPont had been trained on the Rules of the Road, he would have known that under Rule 9(f), he was required to sound an appropriate signal when he was nearing a bend or an area of a narrow channel such as the MR. JOE was in at the time of the accident. If DuPont had known to sound a signal, that would have prevented the accident. DuPont also displayed a lack of understanding of Rule 15 and Rule 16 which together deal with which vessel should give way in a crossing situation. Rule 15 requires that when two power-driven vessels such as the ones at issue here are in a crossing situation, the vessel which has the other on her starboard side shall keep out of the way and shall avoid crossing ahead of the other vessel. Rule 16 requires that the vessel required to keep out of the way take early and substantial action to keep well clear. At trial, DuPont demonstrated that he did not have a clear understanding of these rules. He stated that he was supposed to yield in the situation at issue here "[i]f I see him as far as crossing ahead." Tr. July 24, 2013 at 70. DuPont repeated that he was supposed to yield *if he saw Frickey*. To the contrary, Rule 15 does not state that the vessel operator is only required to yield if he sees the other boat. DuPont conceded that if he had seen Frickey he could have avoided the accident. *Id.* If DuPont had been yielding, as the rule required him to do, as he went into the intersection, he would have avoided the accident even without seeing Frickey from a distance. The Court finds that DuPont did not yield because he had not been properly trained on the Rules of the Road, and therefore, did not understand that he needed to yield to Frickey, the boat on his starboard side. Although DuPont put his engine in neutral and

cut his wheel to the left after he saw Frickey, he did not take early and substantial action, which would have prevented the accident because he did not understand the Rules of the Road.[4] Tr. July 24, 2013 at 47.

### 2. Radar Policy

In addition to failing to train DuPont, BOPCO put a policy in place that led to the accident. The policy was that vessel operators should not use radar during the day. BOPCO had privity or knowledge of the negligent acts that led to the accident because it specifically instructed its captains to do something negligent, and that ultimately led to this collision.

Kenneth Fernandez, BOPCO's area production supervisor who has worked for BOPCO for twenty-two years, explained to the Court that BOPCO does not run radar during the day.[5] Tr. July 24, 2013 at 41. As the Court has already explained, BOPCO was required to use its radar. Fernandez explained that the reason he tells his men not to turn the radar on during the day is that it is "almost looking like at a video game while you're driving." *Id.* Fernandez said that he would prefer for his captains to have their eyes on the waterways. *Id.* BOPCO made its decision to tell its captains not to use radar during the day in contravention of the Rules of the Road.[6] The Court does not understand how radar could be distracting during the day, but not during the night.

---

[4]Frickey also argues that DuPont violated Rule 6 of the Rules of the Road because he did not operate his vessel at a safe speed. Rec. Doc. 117 at 11. The jury did not determine whether DuPont was speeding at the time of the accident, and the Court declines to make a factual determination of his speed on its own. Therefore, it does not find that DuPont necessarily violated Rule 6.

[5]BOPCO told the Court in its post-trial brief that Fernandez was the only licensed U.S. Coast Guard vessel operator to testify at trial. Rec. Doc. 116 at 10. Fernandez testified at trial that he had been licensed in the '80s and let his license expire after five years. Tr. July 24, 2013 at 31. He is not a licensed U.S. Coast Guard vessel operator. The Court does not take misrepresentations lightly, and counsel is again cautioned to be more careful in future cases.

[6]*See* Rule 7(b). Contrary to Fernandez' testimony, there is no exception in the rule for vessels that do not carry passengers. Tr. July 24, 2013 at 42.

Additionally, people drive with GPS devices all the time, and while they may be distracting, they are considered to be more helpful than they are distracting. A device, such as radar, that is not just helpful, but also a tool to ensure greater safety, is surely more of a help than it is a hindrance. Under Judge Learned Hand's theory, the burden of taking the precaution to use radar is certainly less than the probability of the accident multiplied by the injury.[7] It was negligent for BOPCO not to use the radar, and BOPCO propagated the negligence through a policy. Even Fernandez admitted that there is no harm in using radar on a bright, sunny day. Tr. July 24, 2013 at 82.

BOPCO argues that it was acceptable for it not to use radar on its vessel because the Coast Guard had ridden aboard the MR. JOE on bright and sunny days and "approved [Fernandez] not using the radar on clear and sunny days onboard the MR. JOE in these waters." Rec. Doc. 116 at 10. While the Court finds that it is likely that the Coast Guard rode with Mr. Fernandez aboard the MR. JOE, just by riding aboard the vessel without radar, the Coast Guard did not approve non-use of the operational radar system. No representative of the Coast Guard testified at trial. The Court has no way of knowing if the Coast Guard even knew Fernandez was not operating the radar when they rode on the MR. JOE. Just because the Coast Guard had not said anything to Fernandez while it was riding on Fernandez' boat and he was not using radar, does not mean that the Coast Guard approves BOPCO not using its radar system, or that not using radar does not violate the Rules of the Road. Tr. July 24, 2013 at 41.

BOPCO puts forth the theory that even if DuPont had been operating the radar system on the MR. JOE at the time of the accident, the radar would not have worked in the location of the

---

[7]*See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) ("the owner's duty . . . to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions. Possibly it serves to bring this notion into relief to state it in algebraic terms: if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B [is] less than PL.".

accident, and therefore, BOPCO is not liable for the accident. Rec. Doc. 116 at 11.  Neither party

disputes that the accident occurred at an intersection where tall marsh grass had grown along the

banks.  The parties have not agreed on the height of the grass at the time of the accident and

dispute whether the grass obstructed their view as each vessel rounded the corner to the

intersection. Tr. July 24, 2013 at 44 (Fernandez' testimony displaying uncertainty as to the height

of the grass, but approximating that at one time it was 8-10 feet tall); Tr. July 22, 2013 (Frickey's

testimony describing that the grass was three to four feet high on the day of the accident).

        BOPCO's argument that the marsh grass would have blocked the radar and that radar does

not pick up small boats is unfounded. Tr. July 24, 2013 at 65 (DuPont's testimony).  Fernandez

testified that radar will not pick up a vessel in the back levee if the point of sight for the radar is

located below the marsh grass or canes.  Tr. July 24, 2013 at 36.  Yet, BOPCO has not

demonstrated that the MR. JOE'S point of site was below the marsh grass.  In fact, a photo of the

vessel, which was admitted into evidence, demonstrates that the radar was located on top of the

MR. JOE. *See* Trial Exh. 1; *see also* Tr. July 24, 2013 at 32 (where Fernandez identifies the radar

on top of the vessel).  The location of the radar would have had added height to detect Frickey's

vessel over the marsh grass.

        At his deposition, DuPont testified that he would have seen Frickey if he had been using

radar. Tr. July 22, 2013 at 56.  He specifically testified that Frickey's boat is the kind of thing that

would have been picked up by radar. Tr. July 24, 2013 at 86-87.[8]  At trial, DuPont changed his

story and stated that since the time of the accident, he had tried to use radar in the same area, and

it did not work. Tr. July 22, 2013 at 56.  The Court does not find DuPont's trial testimony on this

---

        [8]The fact that Rule 6(b) of the Rules of the Road states that in determining a safe speed
vessels with operational radar should take into account the possibility that small vessels may not
be detected by radar at an adequate range is irrelevant here because the question is not whether a
vessel went undetected while radar was in use.

matter to be credible.  DuPont claimed that he had the occasion to use the radar in the same

location as the accident since the collision because his living quarters were destroyed in

Hurricane Isaac, and as a result he was now regularly traveling from Point à la Hache to Cox Bay

through the Back Levee Canal where the accident occurred. Tr. July 24, 2013 at 64.  DuPont

testified at trial that it was foggy and dark on a day that he took this route, and he had his radar

on, and was looking at the radar when he barely saw a light shining. *Id.*  DuPont claims that he

turned his spotlight on and only saw a vessel ten feet ahead of him when the vessel finally

popped up on his radar. *Id.*  This narrative, stated twice at trial with slight differences, six months

after DuPont stated in his deposition that grass would not affect the radar, is not believable.

DuPont's trial testimony appears contrived.   DuPont had worked for BOPCO for three years

before the deposition and driven to the dock he was approaching on the day of the accident for

three years before the deposition. Tr. July 22, 2013 at 57.  DuPont claims that before his

deposition he had only used the radar in open water. Tr. July 24, 2013 at 63.  However, DuPont

also stated at his deposition that he always saw Frickey on his radar. Tr. July 24, 2013 at 84.

Additionally, as Fernandez explained, even though the grass was high around the sight of the

collision, there were some spots that were clear between the grass. Tr. July 24, 2013 at 38.  The

radar would have shown Frickey's vessel in the clear spots between the grass.  The Court finds

that while the radar may not have worked perfectly over the marsh grass and vegetation, if

BOPCO had been using it, DuPont would have been able to pick up signs of Frickey's vessel

before the collision occurred. *See* Tr. *see also* Tr. July 22, 2014 at 108 (testimony of Frickey's

deckhand Barrios describing how Frickey eventually saw BOPCO through the marsh grass).  The

radar would have prevented the collision by giving DuPont an early warning signal that Frickey

was approaching.

        BOPCO argues that Frickey did not present evidence that the radar would have worked in

this situation.  *See* Tr. July 24, 2013 (DuPont's testimony when he says no one has testified that the radar would have worked in this situation).  It is common sense, based on all of the factual evidence presented at trial, that the radar would have worked.[9]  Despite DuPont taking measures to slow his speed and look both ways for other boats, the collision occurred because DuPont was following company policy and not using radar.  BOPCO had privity or knowledge of the negligent act of not using radar because not using the radar was exactly what BOPCO had told DuPont to do.

The Court finds that BOPCO is not entitled to limit its liability because it had privity or knowledge of the negligent act at issue here through its failure to train DuPont on the Rules of the Road, failure to diligently investigate whether he had previously been trained on the Rules of the Road), and institution of a policy that required DuPont not to use radar on the day of the collision.  *In re Omega Protein, Inc.*, 548 F.3d at 371 (citing *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 789 (5th Cir. 2003)).  BOPCO did not show that it lacked privity or knowledge of the negligent condition that the jury found in this case. *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996).  The Court finds that BOPCO's failure to train its captain was similar to the petitioner's failure to train the captain in *Trico Marine*. 332 F.3d at 790 (denying limitation of liability where the corporation, among other failures, failed to train the captain to use radar); *see also Gatreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 783-84 (5th Cir. 1996), *vacated in part on other grounds*, 107 F.3d 331 (5th Cir. 1997)

---

[9]Fernandez was not qualified in any type of science or radar expertise, but he explained at trial that the reason that the radar would not have worked is because "the radar puts out radar waves and bounces off and returns back to the radar; and it's not the x-ray wave, so it can't go through the canes." He said that when he was driving through the back levee the radar would just look like a land mass on the radar screen (prior to Hurricane Isaac), and the radar would not "see around these corners." While the Court agrees that radar does not operate as an x-ray, it is clear that its scope is likely to have been larger than Fernandez contends it to have been.

(refusing to limit liability because petitioner had privity or knowledge of the negligent acts because the owner failed to train its relief captain in the proper operation of an electric winch and that failure in part caused the relief captain's injuries); *Verrett v. McDonough Marine Services*, 705 F.2d 1437, 1444 (5th Cir. 1983) (finding privity or knowledge, and hence not limiting liability, in a case where the vessel owner did not use due and proper care to provide a competent master and crew and to see that the ship was seaworthy).

### III. DAMAGES

The jury found by a preponderance of the evidence that defendant BOPCO was negligent and that such negligence was a proximate cause of damage to plaintiff Frickey. Rec. Doc. 108-1 at 1.  The jury also found by a preponderance of the evidence that plaintiff Frickey himself was negligent and that Frickey's negligence was a proximate cause of his own damage. *Id.*  It apportioned damages between the parties to be 75% proximately caused by BOPCO's negligence and 25% proximately caused by Frickey's negligence. *Id.* at 1-2.  The jury than awarded damages in the amount of (A) $344,762.37 for medical expenses, past and future; (B) $67,000.00 for loss of earning capacity, past and future; (C) $205,000.00 for physical pain and suffering, past and future; and (D) $490,000.00 for mental anguish and emotional distress, past and future. *Id.* at 2. After fault is apportioned according to the jury's finding of negligence, the damages to be awarded to Frickey equal (A) $258,571.78 for medical expenses, past and future; (B) $50,250.00 for loss of earning capacity, past and future; (C) $153,750.00 for physical pain and suffering, past and future; and (D) $367,500.00 for mental anguish and emotional distress, past and future.

Frickey asked the Court to grant him prejudgment interest at the rate of 5.5 percent.  Rec. Doc. 123 at 6-7.  A seaman may receive prejudgment interest for past but not future damages. *Brister*, 946 F.2d at 362.  The Court did not differentiate between past and future damages on its jury form, and Frickey did not object to the verdict form. Rec. Doc. 108-1; Rec. Doc. 110.

Frickey waived any objection at this time.  The Court cannot speculate as to which portion of the damages were for past damages.  Therefore, the Court denies Frickey prejudgment interest.

### IV. CONCLUSION

The Court finds that BOPCO is not entitled to limit its liability.  The Court adopts the jury's opinion as its own. Rec. Doc. 108-1.  Frickey is entitled to post-judgment interest at the judicial rate from the date of judgment until paid on all elements of recovery.  Frickey is entitled to his costs.

Accordingly,

IT IS ORDERED that judgment be entered in favor of the plaintiff and against the defendant.

IT IS FURTHER ORDERED that Frickey is awarded damages of $830,071.78 consisting of damages for:

(A) $258,571.78 for past and future medical expenses;

(B) $50,250.00 for past and future loss of earning capacity;

(C) $153,750.00 for past and future physical pain and suffering; and

(D) $367,500.00 for past and future  mental anguish and emotional distress.

New Orleans, Louisiana, this 9th day of September, 2013.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE